**O**

**JS-6**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSTRUCTION LABORERS TRUST FUNDS FOR SOUTHERN CALIFORNIA ADMINISTRATIVE COMPANY, a Delaware limited liability company,<br><br>             Plaintiff,<br><br>    v.<br><br>PRECISION MASONRY BUILDERS, INC, a California corporation; KERRYANNE ANZALONE, JR., an individual; BLASÉ ANZALONE, JR., an individual; T.B. PENICK & SONS, INC., a California corporation; LIBERTY MUTUAL INSURANCE COMPANY, a Massachusetts corporation; and DOE 1 through DOE 4, inclusive,<br><br>             Defendants. | Case No. 2:16-cv-04358-ODW(AFMx)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT [65]** |

# I.   INTRODUCTION

Plaintiff Construction Laborers Trust Funds for Southern California Administrative Company ("Plaintiff") brings this action against Defendants Precision Masonry Builders, Inc. ("Precision"), KerryAnne Anzalone, and Blase Anzalone, Jr. (collectively, "the Anzalones") (collectively, "Defendants") for (1) Contributions to Employee Benefit Plans; (2) Specific Performance Compelling an Audit; (3) Damages for Breach of Fiduciary Duties; and (4) Recovery Against Payment Bond.  (*See* First Amended Complaint ("FAC"), ECF No. 40.)  Defendants have failed to respond to the Complaint, and the Clerk entered default on September 7, 2017 and on October 4, 2017.  (ECF Nos. 52, 61.)  Plaintiff now moves for entry of default judgment against Defendants.  (ECF No. 65.)  For the reasons discussed below, the Court **GRANTS** the Motion.[1]

# II.   BACKGROUND

## A.   Factual Background

Plaintiff is an administrator and agent for the collection of several employee benefit plans ("Trust Funds") and a fiduciary to the Trust Funds.  (FAC ¶ 3.)  Each one is an express trust, created by written agreements and qualifying as a multi-employer plan within the meaning of the Employee Retirement Income Security Act ("ERISA") § 3(37)(A), 28 U.S.C. § 1002(37)(A).  (*Id.*)  In order to work on projects for the San Diego Unified School District ("SDUSD"), Precision became bound by the SDUSD Project Stabilization Agreement Construction and Major Rehabilitation Funded by Proposition S ("SDUSD PSA") between SDUSD and San Diego Building and Construction Trades Council, and their signatory Craft Unions (one of which is Southern California District Council of Laborers and affiliated Laborers Local No. 89 ("Union")).  (*Id.* ¶ 18.)

---

[1] Having carefully considered the papers filed in support of and in opposition to the instant Motion, the Court deems the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; L.R. 7-15.

Pursuant to the SDUSD PSA, Precision is bound to the various Trust Agreements, which established each of the Trust Funds. (*Id.* ¶ 19.) The Trust Agreements obliged Precision to submit monthly fringe benefit contributions to the Trust Funds under the Union's collective bargaining agreements ("CBA") for each hour worked (or paid for) by employees performing services covered by the CBA. (*Id.*) Additionally, Precision was required to submit monthly reports, detailing the name, address, social security number, and hours worked that month for each employee covered. (*Id.*) These monthly reports were required even when there were no employees to report for the reporting period. (*Id.*)

Plaintiff alleges that the monthly fringe benefit contributions constitute assets of the Trust Funds, and as a Trustee, it has a fiduciary duty to marshal those assets so they may be applied for the benefit of the participants and beneficiaries in accordance with the various Trust Agreements. (*Id.*) Under the CBA, if Precision fails to timely pay monthly fringe benefit contributions, then Precision is obligated to pay liquidated damages in the sum of $25.00 or 20% of the unpaid benefits to each of the Trust Funds. (*Id.* ¶ 20.) Precision would also be required to pay interest at the per annum rate of 5% over the rate set by the Federal Reserve Board, effective on the date each contribution is due. (*Id.* ¶ 21.) The CBA provides Trust Funds with the authority to audit Precision's payroll and business records, and Precision is liable for the costs of such audit. (*Id.* ¶ 23.)

Precision employed workers who are covered by the CBA; however, Precision failed to pay the monthly fringe benefits to the Trust Funds. (*Id.* ¶ 24.) It also refused to comply with an audit by the Trust Funds. (*Id.*) As a result of Precision's failure to pay the specified rates from November 2011 and February 2012 through December 2016, Plaintiff alleges damages of $45,788.25, plus additional accrued interest at the plan's rate—6.75% as of June 15, 2017—until payment of the contributions is made. (*Id.* ¶ 26.) This sum consists of $13,888.33 in unpaid fringe benefits, $29,505.61 in

liquidated damages, $35.00 in returned check fees, $720.00 audit fees, and $1,639.31 in interest on the late and/or unpaid fringe benefits owed through June 2, 2017.[2]  (*Id.*)

Plaintiff alleges that it, and its participants, have also suffered harm that is impractical to accurately quantify.  (*Id.* ¶ 27.)  For example:

> [T]he costs of collecting the Monthly Contributions from [Precision] or third parties (not including the cost of this litigation), cost of special processing to restore benefit credits because of late Monthly Contributions, the temporary loss of insurance coverage by employees (even if later restored)[,] and medical harm to participants and beneficiaries who may have foregone medical care when notified that medical insurance ceased because of their employer's failure to pay Monthly Contributions.

(*Id.*)  Plaintiff alleges that the purpose of the liquidated damages provisions of the CBA was to compensate for this type of unquantifiable harm.  (*Id.*)  Although Plaintiff—as a Trustee—has the authority to waive part or all of the liquidated damages, it has chosen not to do so.  (*Id.*)

Plaintiff alleges that the Anzalones are fiduciaries and/or parties in interest to the Trust Funds under 29 U.S.C. §§ 1002(14), 1002(21)(A), because they exercised discretionary authority or control respecting management or disposition of the Trust Funds' assets.  (*Id.* ¶¶ 12, 38, 43.)  Plaintiff further alleges that the Anzalones are majority shareholders and/or the beneficial owners of Precision.  (*Id.* ¶ 14.)  They acted on behalf of Precision in their dealings and relations with the Trust Funds and the Union and determined which employees and hours worked would be reported to the Trust Funds.  (*Id.* ¶¶ 13–16.)  Specifically, the Anzalones "are responsible for running the day to day operations and day to day financial decisions of [Precision]," and for "decisions pertaining to the reporting and payment of contributions."  (*Id.*

---

[2] The FAC also claimed additional fringe benefits, liquidated damages, audit fees, and interest according to proof at the time of trial.  (*Id.* ¶¶ 24, 35.)

¶ 13.) The Anzalones "personally maintained control of those funds which should have been turned over to the [Trust Funds]." (*Id*.)

The CBA provides that Precision is responsible for the Trust Funds' attorneys' fees related to any legal action necessary to compel the audit, and for the audit fees necessary to complete the audit of Precision's records. (*Id.* ¶ 32.) The CBA also requires that Precision deduct monthly fringe benefits due to the Construction Laborers Vacation Trust Fund for Southern California ("Vacation Fund") from employees' weekly paychecks in the amount specified. (*Id.* ¶ 39.) Plaintiff alleges that Precision and/or the Anzalones did not distribute the portions of the prevailing wage that Precision certified was to be paid to the Trust Funds from the employees' weekly paychecks and kept those amounts for their own use. (*Id.* ¶ 41.)

Plaintiff alleges that the Anzalones are responsible for preparing and issuing certified payroll reports to public agencies under California Labor Code § 1776, and allege that the Anzalones had,

> [D]iscretionary authority or control over sufficient, segregable funds to pay the amounts certified under penalty of perjury, that would be withheld from employees' weekly wages for contribution to the Trust Funds in order to meet prevailing wage obligations, including the authority to write checks on the accounts in which such funds were held, but instead kept them for his own use, or for the use of [Precision].

(FAC ¶ 42.) Plaintiff alleges that Precision failed to timely account for and turn over the assets of the Trust Funds and further failed to apply such assets for the exclusive benefit of participants and beneficiaries of the Trust Funds. (*Id.* ¶ 45.) Precision instead used those assets for its own benefit, breaching its fiduciary duties to the Trust Funds within the meanings of section 404(a)(1)(A),(B),(D) or ERISA, 29 U.S.C. §§ 1104(a)(1)(A),(B),(D). (FAC ¶ 45.) Plaintiff contends that the acts and omissions by Precision or the Anzalones constitute misuse, misappropriation, and/or conversion

from employee benefit plans within the meaning of 18 U.S.C. § 664 and breach of their fiduciary obligations within the meaning of 29 U.S.C. §§ 1104–06. (FAC ¶ 46.)

Pursuant to section 409 of ERISA, 29 U.S.C. § 1109, Plaintiff alleges that Precision and the Anzalones are personally liable to restore to the Trust Funds any losses to them resulting from the breach of their fiduciary duties. (*Id.* ¶ 47.) Plaintiff now seeks to recover from both Precision and the Anzalones, jointly and severally: **$81,969.24 against Precision**, consisting of $1,387.33 in unpaid fringe benefit contributions, $29,505.61 in liquidated damages, $720.00 in audit fees, $1,092.55 in interest, $48,175.00 in attorneys' fees, and $1,088.75 in costs; and **$81,249.24 against the Anzalones**, consisting of $1,387.33 in unpaid fringe benefit contributions, $29,505.61 in liquidated damages, $1,092.55 in interest, $48,175.00 in attorneys' fees, and $1,088.75 in costs. (Decl. of Marsha M. Hamasaki ("Hamasaki Decl.") ¶¶ 16, 29, ECF No. 67.) Additionally, under 29 U.S.C. §§ 1132(a)(3), 1132(g)(2)(E), Plaintiff requests for the Court to order Precision to comply with its obligation under the CBA and ERISA to fully produce its books and records so that Plaintiff can complete an audit to determine if additional amounts are due. (FAC ¶ 34.)

**B.** **Procedural Background**

On June 17, 2016, Plaintiff filed a Complaint against Defendants, Precision Masonry Builders, Inc. ("Precision") and Suretec Indemnity Company ("Suretec"). (Compl., ECF No. 1.) Precision failed to answer Plaintiff's Complaint, and Default was entered against Precision on August 1, 2016. (ECF No. 17.) Pursuant to a settlement agreement, Suretec was dismissed on August 2, 2016. (ECF No. 18.) On August 2, 2016, Plaintiff filed an Interlocutory Appeal for Accounting, and the Court granted the motion on August 23, 2016, requiring Precision to submit to an audit of its books and records for the purpose of ascertaining the contributions due to the Plaintiff. (ECF Nos. 19, 23.) Precision failed to comply with the Court's Order for Accounting, and on October 20, 2016, Plaintiff filed an Application for Order to Show Cause regarding Contempt against Precision. (ECF No. 26.) On October 24, 2016, the

Court granted Plaintiff's Application and set an Order to Show Cause hearing for December 9, 2016. (*Id.*) Precision failed to appear or submit a written response before December 2, 2016, and the Court imposed a $5,000 fine and issued a bench warrant for the arrest of Precision's CEO, KerryAnne Anzalone. (ECF Nos. 28, 34.)

On June 22, 2017, Plaintiff filed a motion to amend the complaint and noticed a hearing for August 7, 2017, on the motion. (ECF No. 36.) Precision failed to oppose the motion, and on July 18, 2017, the Court granted Plaintiff's motion. (ECF No. 39.) In its FAC, Plaintiff brought four claims against Defendants, Precision, the Anzalones, T.B. Penick & Sons, Inc., and Liberty Mutual Insurance Company: (1) Contributions to Employee Benefit Plans; (2) Specific Performance Compelling an Audit; (3) Damages for Breach of Fiduciary Duties; and (4) Recovery Against Payment Bond.[3]

Plaintiff served Precision with the FAC on July 31, 2017 (ECF No. 45) and served the Anzalones on August 29, 2017 (ECF Nos. 51, 53). Defendants failed to plead, respond, or otherwise defend in the present action. (ECF Nos. 52, 61.) As a result, on September 6, 2017, Plaintiff requested that the Clerk enter default against Precision, and the Clerk entered a default on September 7, 2017. (ECF Nos. 50, 52.) On October 3, 2017, Plaintiff requested that the Clerk enter default against the Anzalones, and the Clerk entered default on October 4, 2017. (ECF Nos. 60–61.) Shortly thereafter, Plaintiff moved for entry of default judgment against Defendants. (ECF No. 65.) That Motion is now before the Court.

### III. LEGAL STANDARD

Before a court can enter a default judgment against a defendant, a plaintiff must satisfy the procedural requirements for default judgment set forth in Federal Rules of Civil Procedure 54(c) and 55(a), as well as Local Rule 55-1. Local Rule 55-1 requires that the movant submit a declaration establishing: (1) when and against whom default

---

[3] Plaintiff settled the fourth Claim for relief against Defendants, T.B. Penick & Sons, Inc., and Liberty Mutual Insurance Company, who have been dismissed from this lawsuit. (ECF No. 55.) Therefore, the fourth claim is not at issue and the Court need not address it here.

was entered; (2) identification of the pleading entering default; (3) whether the defaulting party is a minor, incompetent person, or active service member; and (4) that the defaulting party was properly served with notice. *Vogel v. Rite Aid Corp.*, 992 F. Supp. 2d 998, 1006 (C.D. Cal. 2014).

Federal Rule of Civil Procedure 55(b)(2) authorizes district courts discretion to grant default judgment after the Clerk enters default under Rule 55(a). *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). When moving for a default judgment, the well-pleaded factual allegations in the complaint are accepted as true, with the exception that allegations as to the amount of damages must be proved. *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–19 (9th Cir. 1987) (per curiam); *see also* Fed. R. Civ. P. 54(c) ("[A] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.").

In exercising its discretion, the Court considers the *Eitel* factors: (1) the possibility of prejudice to plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake; (5) the possibility of a dispute concerning material facts; (6) whether defendant's default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

## IV. DISCUSSION

### A. Procedural Requirements

Plaintiff has satisfied the procedural requirements for the entry of a default judgment against Defendants. The Clerk entered a default against Defendants on September 7, 2017 and on October 4, 2017. (ECF Nos. 52, 61.) Plaintiff's counsel has declared that: (1) Defendants are not infants or incompetent persons; (2) Defendants are not covered under the Servicemembers Civil Relief Act, and (3) Defendants were served with the Motion for Default Judgment. (Hamasaki Decl. ¶¶ 2–4.) Plaintiff has therefore complied with the Federal Rules of Civil Procedure

54(c) and 55, as well as Local Rule 55-1. In addition, the circumstances support entry of default judgment against Defendants in the amount Plaintiff requests.

**B.    *Eitel* Factors**

The Court concludes that the *Eitel* factors weigh in favor of entering a default judgment. The Court will discuss each factor in turn.

**1.    Plaintiff Would Suffer Prejudice**

The first *Eitel* factor asks whether the plaintiff will suffer prejudice if a default judgment is not entered. *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). Defendants have failed to participate in this action, and without a default judgment, Plaintiff will have no other recourse for recovery. (ECF Nos. 52, 61.) Therefore, this factor favors entry of default judgment.

**2.    Plaintiff Brought Meritorious Claims and Plaintiff's Complaint
        Was Sufficiently Pleaded**

The second and third *Eitel* factors "require that a plaintiff 'state a claim on which [it] may recover.'" *PepsiCo*, 238 F. Supp. 2d at 1175; *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 499 (C.D. Cal. 2003). Plaintiff asserts three claims against Defendants: (1) Contributions to Employee Benefit Plans; (2) Specific Performance Compelling an Audit; and (3) Damages for Breach of Fiduciary Duties. (*See generally* FAC.)

**a.    ERISA Violation**

Under ERISA, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145; *see also Winterrowd v. David Freedman & Co., Inc.*, 724 F.2d 823, 826 (9th Cir. 1984). If the employer fails to do so, the plan or a plan fiduciary may bring an action to recover the unpaid contributions. 29 U.S.C.

§ 1132(d)(1); *see Bd. of Trustees of Bay Area Roofers Health & Welfare Trust Fund v. Westech Roofing*, 42 F. Supp. 3d 1220, 1224 (N.D. Cal. 2014).

Here, the FAC alleges that Defendants were obligated to make monthly contributions to the Trust Funds. (FAC ¶ 19.) Plaintiff presents evidence that shows the Defendants were bound by a written collective bargaining agreement by which it agreed to become bound by the written Trust Agreements that established the Trust Funds. (*Id.*) As an employer obligated under the terms of the CBA to make contributions to the Trust Funds, Defendants' failure to make such contributions constitutes a violation of section 515 of ERISA. *See* 29 U.S.C. § 1145. Moreover, the Defendants cannot dispute the accuracy of the contribution reports they themselves submitted to the Trust Funds, nor the audits based on Precision's certified payroll records. (*See* Decl. of Yvonne Higa ("Higa Decl."), Exs. 8–9, 13.1–13.21, ECF No. 66.) Defendants, by their default, admit liability for the claims asserted, which entitles Plaintiff to unpaid fringe benefit contributions, interest thereon, liquidated damages, and reasonable attorneys' fees and costs for amounts owed under 29 U.S.C. § 1145. (FAC ¶¶ 26, 44–45); *see* 29 U.S.C. § 1132(g)(2). Additionally, the Trust Agreements contain provisions requiring employers to pay fringe benefits on all hours worked (or paid for) by employees performing services under the Trust Agreements. (Higa Decl. ¶¶ 9–13; FAC ¶¶ 19–23, 26, 32.) These provisions are consistent with 29 U.S.C. § 1132(g) and support the Court's conclusion. As such, the Court finds that Plaintiff has sufficiently pleaded a meritorious claim for breach of the CBA and violation of ERISA.

**b.    Joint and Several Liability**

Plaintiff also alleges that the Anzalones are jointly liable with Precision for the delinquent monthly contributions, liquidated damages, interest, attorneys' fees, and costs. (FAC 19–20, ¶ 44.)

Plaintiff argues that the Anzalones, as Precision's president, CEO, and majority shareholders, are managing officers responsible for the financial decisions of assets of

the Trust Funds and therefore fall within the definition of fiduciary. (FAC ¶¶ 5–6, 38.) Under ERISA, "[a] person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). Any individual who acts as a fiduciary with respect to a plan or trust covered by ERISA can be liable for breach of fiduciary duty under ERISA. *See Acosta v. Pacific Enters*., 950 F.2d 611, 617 (9th Cir.1991).

The Ninth Circuit liberally construes the definition of fiduciary under ERISA. *See Arizona State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 720 (9th Cir. 1997). To determine whether the Anzalones are fiduciaries, the Court must resolve (1) whether the unpaid contributions are trust assets, and (2) whether the Anzalones did in fact exercise authority or control over these assets. *Bd. of Trustees of Airconditioning & Refrigeration Indus. Health & Welfare Tr. Fund v. J.R.D. Mech. Servs., Inc.*, 99 F. Supp. 2d 1115, 1120 (C.D. Cal. 1999).

First, employee wage deductions intended as plan contributions are plan assets, regardless of whether such money is ever, in fact, conveyed to the plan. *See* 29 C.F.R. § 2510.3–102. Plaintiff contends that the deducted benefits for contribution to the Trust Funds are plan assets as defined by federal regulation, 29 C.F.R. § 25103-102(a)(1) and 19 C.F.R. § 2510.3-102(c). The Trust Agreements provide that benefits are earned by employees but submitted by their employers to the Trust Funds. (Higa Decl., Ex. 2.) Courts have held that withheld funds are assets of the fund to which they are due and that an entity or person that determines whether and how much to contribute, controls the disposition of such plan assets and is a fiduciary to the fund with respect to them. *J.R.D. Mech. Servs., Inc.*, 99 F. Supp. 2d 1115, 1121–22 (C.D. Cal. 1999); *see Phelps v. C.T. Enterprises*, 394 F.3d 213, 219–21 (4th Cir. 2005); *United States v. Grizzle*, 933 F.2d 943, 947 (11th Cir. 1991).

Here, Precision worked on SDUSD and public works projects, which required its workers to be paid the "prevailing wages" on the projects. Cal. Labor Code § 1774; (Hamasaki Decl. ¶ 13.) Precision and the Anzalones deducted the monthly fringe benefit contribution portion of the employees' wages on public works projects for contribution to the Trust Funds. (Higa Decl. ¶¶ 19–24.) However, Defendants failed to report and/or remit those deducted contributions to the Trust Funds, and the certified payroll records do not support that the payments were made directly to the employees. (*Id.*) Plaintiff alleges that Precision, through the Anzalones, underpaid the prevailing rate by $13.38. (Mot. 18, ECF No. 68; *see* Higa Decl., Ex. 11.1; Hamasaki Decl. ¶ 13, Ex. 12.1.) Because the employee wage deductions were intended as plan contributions, the unpaid employer contributions are plan assets under ERISA.

Second, "'[a]ny' control over disposition of plan money makes the person who has the control a fiduciary." *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997). Here, the Anzalones were responsible for the reporting and payment obligations of Precision's debts, including the contributions owed on behalf of Precision's workers. (FAC ¶ 37.) Therefore, the Court finds that the Anzalones' defaults and supporting declarations demonstrate that they have exercised discretionary authority or control over the management of the Trust Fund's assets. (*See* Higa Decl. ¶ 21; Hamasaki Decl. ¶¶ 8.1–8.2); *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1459 (9th Cir. 1995) ("This court has held corporate officers to be liable as fiduciaries on the basis of their conduct and authority with respect to ERISA plans."). Accordingly, the Anzalones are fiduciaries to the Trust Funds under 29 U.S.C. § 1002(21)(A).

Under ERISA, a fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to [them]." 29 U.S.C. § 1104(a)(1). Thus, ERISA prohibits a fiduciary from dealing "with the assets of the Plan in his own interest and

for his own account." 29 U.S.C. § 1106(b)(1); *see J.R.D. Mech. Servs., Inc.*, 99 F. Supp. at 1122 ("The Ninth Circuit liberally construes this provision to protect plan participants and beneficiaries."). Here, the deducted contributions owed on behalf Precision, and not turned over to the Trust Funds, give rise to the Anzalones' liability for the amounts deducted from the employees' wages and damages. Therefore, the Court finds that the Anzalones breached their fiduciary duty under 29 U.S.C. § 1104(a)(1), because they failed to pay the full compensation and withheld from payment deducted contributions payable to the Trust Funds.

Under section 409(a) of ERISA, 29 U.S.C. § 1109(a), which provides, in pertinent part, that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries" is personally liable "to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . . ." Because the Anzalones are fiduciaries under ERISA and they breached their duty, each is personally liable for the unpaid contributions. As such, the Court finds that Plaintiff has sufficiently pleaded a meritorious claim for joint and several liability against the Anzalones.

### c.   Specific Performance Compelling Audit

In addition to monetary damages, Plaintiff requests that the Court exercise its authority under 29 U.S.C §§ 1132(g)(2)(E) and 1132(a)(3) to order Precision to comply with its obligations under the Agreements and ERISA to fully produce its books and records in order for Plaintiff to complete an audit to determine if additional amounts are due. (FAC ¶ 34.) Plaintiff seeks this equitable relief pursuant to 29 U.S.C. § 1132(g)(2)(E), which provides that the Court shall award "other legal or equitable relief as the court may deem appropriate" in an action to enforce a multiemployer plan in which the fiduciary obtains a favorable judgment.

The Court has recognized Plaintiff's right to an audit of Precision's records and previously entered an Interlocutory Order for Accounting on August 23, 2016. (ECF

No. 23.)  Moreover, the Trust Agreements require Precision to submit to an audit. (Higa Decl. ¶¶ 15–16.)  Because Defendants have not complied with the Court's Interlocutory Order for Accounting, the entry of judgment has been delayed.  Further, based on Plaintiff's uncontested allegations, Plaintiff has pleaded a sufficiently meritorious claim, and the Court deems specific performance compelling audit an appropriate equitable relief under 29 U.S.C. § 1132(g)(2)(E).  Therefore, the Court finds that the Plaintiff is entitled to a final order for accounting and **ORDERS** Defendants to submit to an audit of Precision's payroll and business records as follows:

From October 1, 2015 to the date of the audit, the following documents relating to Precision's work on projects for the SDUSD:

    (1)    All payroll and employee documents including, but not limited to, Precision's payroll journals, employees' earning records, certified payrolls, payroll check books and stubs, canceled payroll checks, payroll time cards, state and federal payroll tax returns, labor distribution journals, any other documents reflecting the number of hours which Precision's employees worked, their names, social security numbers, addresses, job classifications and the projects on which the employees performed their work.

    (2)    All Precision's job files for each contract, project or job on which Precision worked, including all documents, agreements, and contracts between Precision, and any general contractor, subcontractor, builder and/or developer, field records, job records, notices, project logs, supervisor's diaries or notes, employees diaries, memorandum, releases and any other documents which related to the supervision of Precision's employees and the projects on which they performed their work.

    (3)    All Precision's documents related to cash receipts, including

but not limited to, the cash receipts journals, accounts receivable journal, accounts receivable subsidiary ledgers and billing invoices for all contracts, projects or jobs on which Precision worked.

(4)    All Precision's bank statements for all checking, savings and investment accounts.

(5)    All Precision's documents related to cash disbursements, including but not limited to, vendors' invoices, cash disbursement journal, accounts payable journals, check registers, cancelled checks and all other documents which indicate cash disbursements.

(6)    All Monthly Report Forms submitted by Precision to any union trust fund.

(7)    Documents, records, or other writings pertaining to and including the checks/payments issued to any person, company and/or subcontractor relating to work performed on Precision's construction projects, including but not limited to day laborers, or other non-union workers hired to work on Precision's project.

**3.    Amount at Stake**

The fourth *Eitel* factor balances the sum of money at stake with the "seriousness of the action." *Lehman Bros. Holdings Inc. v. Bayporte Enters., Inc.*, No. C 11–0961–CW (MEJ), 2011 WL 6141079, at *7 (N.D. Cal. Oct. 7, 2011). The amount at stake must not be disproportionate to the harm alleged. *Id.* Default judgments are disfavored where the sum of money requested is too large or unreasonable in relation to a defendant's conduct. *Truong Giang Corp. v. Twinstar Tea Corp.*, No. C 06–03594 JSW, 2007 WL 1545173, at *12 (N.D. Cal. May 29, 2007).

The Court finds the damages requested by Plaintiff are reasonable. The total amount Plaintiff seeks to recover is $81,969.24 against Precision and $81,249.24 against the Anzalones, jointly and severally. (Hamasaki Decl. ¶ 29.) These totals consist of fringe benefits, liquidated damages, audit costs, interest, attorneys' fees, and

costs. (*Id.*) Although the amount at stake is relatively large, Plaintiff has presented sufficient evidence that the amount they seek is legitimate and warranted. (*See* Higa Decl., Exs. 14–14.3.) The alleged damages that Plaintiff seeks are consistent with the terms of the agreements and are supported by verifiable monthly reports and well-documented schedules of expenses. (*Id.*, Exs. 4–6, 13.1–13.21.) The Court finds that the amount at stake is reasonably proportionate to the harm caused by Defendants' failure to pay contributions and subsequent refusal to comply with the audits. Thus, the amount at stake favors entry of default judgment.

### 4. There is No Possibility of Dispute as to Material Facts

The next *Eitel* factor considers the possibility that material facts are disputed. *PepsiCo*, 238 F. Supp. 2d at 1177. The general rule is that a defaulting party admits the facts alleged in the complaint as true. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). As discussed, Plaintiff has adequately alleged the facts necessary to establish the claims in its Complaint, and Defendants have not challenged the validity of Plaintiff's allegations. (ECF Nos. 52, 61.) Accordingly, the Court finds that this factor also weighs in favor of default judgment.

### 5. Defendants' Default Was Not Due to Excusable Neglect

There is little possibility of excusable neglect and default judgment is favored when defendants fail to respond after being properly served. *See Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1082 (C.D. Cal. 2012). Here, Plaintiff served Defendants with the FAC on July 31, 2017 and August 29, 2017, and with the present motion on January 8, 2018. (ECF Nos. 45, 51, 53.) Additionally, Plaintiff repeatedly attempted to advise Defendants of the delinquencies prior to filing this motion, yet Defendants failed to participate in this litigation in any meaningful way. (Hamasaki Decl. ¶ 10, Exs. 7, 8.1–8.2, 9–11.) There is no evidence in the record that Defendants' default was the result of excusable neglect. Accordingly, the sixth *Eitel* factor favors entry of a default judgment.

### 6. Decision on the Merits

In *Eitel*, the court maintained that "[c]ases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. However, where, as here, defendants fail to answer the plaintiff's complaint, "a decision on the merits [is] impractical, if not impossible." *See PepsiCo*, 238 F. Supp. 2d at 1177. Because Defendants failed to respond to Plaintiff's FAC, the Court finds that the seventh *Eitel* factor does not preclude entry of a default judgment.

## C. Damages

Because Plaintiff is entitled to default judgment, the Court must determine the proper amount of damages. In an action to recover delinquent contributions, the Court must award the following:

> (A) the unpaid contributions,
> (B) interest on the unpaid contributions,
> (C) an amount equal to the greater of--
> (i) interest on the unpaid contributions, or
> (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
> (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
> (E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2). Plaintiff cannot rely solely on allegations to establish damages, for "even a defaulting party is entitled to have its opponent produce some evidence to support an award of damages." *LG Elec., Inc. v. Advance Creative Computer Corp.*, 212 F. Supp. 2d 1171, 1178 (N.D. Cal. 2002); *see also Wecosign*, 845 F. Supp. 2d at 1079 ("[A]llegations of the amount of damages suffered are not necessarily taken as true."). Here, in addition to unpaid contributions, Plaintiff requests the Court award liquidated damages, interest, and audit costs, plus attorneys' fees and costs. (FAC ¶¶ 26, 35, 44.) The Court addresses each request in turn.

### 1. Fringe Benefits

Plaintiff seeks $1,387.33 in unpaid fringe benefits. (Hamasaki Decl. ¶ 29.) This total is based on monthly reports and audits that are detailed on the spreadsheets attached. (*See* Higa Decl., Ex. 14–14.1.) Plaintiff's claim covers time periods from November 2011 and February 2012 to December 2016 based on the monthly fringe benefit reports and partial audit reports. (*Id.* ¶ 24, Exs. 8–9, 13.1–13.21.)

Plaintiff also seeks recovery of the amounts owed in relation to Precision's January 2017 contribution report submitted *after* the FAC was filed. (Higa Decl., Ex. 13.21.) Plaintiff argues that the damages sought are not limited to those amounts specifically pleaded in the Complaint, because Plaintiff prayed for additional damages according to proof at trial. (FAC ¶ 26); *see Henry v. Sneiders*, 490 U.S. 1060 (1974).

The Ninth Circuit, in *Northwest Administrators, Inc. v. Albertsons*, 104 F.3d 253, 257–58 (9th Cir. 1996), upheld a plan's right to liquidated damages under 1132(g)(2) for the delinquent amounts discovered post-suit but pre-trial. The court outlined three requirements: "(1) The employer must be delinquent at the time the action is filed; (2) The district court must enter a judgment against the employer; and (3) The plan must provide for such an award." *Id.* at 257 (citation omitted). Here, Plaintiff has satisfied these requirements. First, at the time the action was filed, Defendants owed Plaintiff delinquent fringe benefit contributions, liquidated damages, interest, and audit fees. (FAC ¶ 26.) Defendants were also delinquent in their submission of reports and refused to comply with an audit. (Higa Decl. ¶¶ 25–30.) Second, as discussed above, Plaintiff has pleaded meritorious claims to support a default against the employer. Third, the Trust Agreements provide for fringe benefits, liquidated damages, audit fees, and interest. (*Id.* ¶¶ 10–18.) Therefore, Plaintiff has satisfied the three requirements and is entitled to recovery on all amounts discovered after the suit was filed.

Because the amount Plaintiff seeks is sufficiently supported by calculations in the declaration of Yvonne Higa, the Court finds that an award in the amount requested is warranted. Accordingly, the Court awards Plaintiff's a total of $1,387.33 for unpaid

fringe benefit contributions owed by Defendants, pursuant to 29 U.S.C. § 1132(g)(2)(A).

### 2.  Liquidated Damages

Plaintiff also requests $29,505.61 in liquidated damages.  (FAC ¶ 26.)  Under 29 U.S.C. § 1332, liquidated damages on unpaid contributions are mandatory and are awarded at the rate provided for in the applicable agreement, or an amount equal to the prejudgment interest, whichever is greater.  *See* 29 U.S.C. § 1132(g)(2)(C); *Operating Eng'rs Pension Tr. v. Beck Eng'g & Surveying Co.*, 746 F.2d 557, 569 (9th Cir. 1984).

Section 502(g)(2)(C)(ii) of ERISA provides that when a judgment in favor of a plan is awarded, a court shall award a plan: "[l]iquidated damages provided for under the plan in an amount not in excess of twenty percent (or such higher percentages as may be permitted under federal or state law) of the amount determined by the court [to represent the unpaid contributions]."  Here, the Trust Agreements provide for liquidated damages at $25.00 or 20% of the contribution, whichever is the greater amount.  (Higa Decl. ¶¶ 27–28.)  Plaintiff argues that the Trust Agreement provisions relating to the assessment of liquidated damages in excess of that provided for by ERISA § 502(g)(2)(C)(ii), are not invalid merely because they provide for liquidated damages which, in some instances, will be greater than 20%.

The Court agrees, because if the liquidated damages provisions of the Trust Agreements are permissible under state law, then they are still enforceable.  *See* 29 U.S.C. § 1132(g)(2)(C)(ii).  Under California law, a liquidated damages provision is valid, unless the party opposing the provision establishes that it was unreasonable at the formation of the contract. *Cal. Civ. Code* § 1671(b).  Here, Defendants have failed to participate in this litigation and therefore have not met their burden to prove unreasonableness.

Moreover, Plaintiff argues that the harm caused by the Defendants' breach is difficult, if not impossible, to accurately quantify, and that the 20% liquidated

damages figure is a reasonable forecast of just compensation for the harm caused. (Higa Decl. ¶¶ 31–38.) Plaintiff set forth the ratio of cost of collections to gross collections. (*Id.* ¶ 36.) The average collection ratio, beginning in 1972 through December 2014, is 26.90%—which demonstrates the reasonableness of the $25.00 minimum and/or the 20% rate in the liquidated damages provision.

Defendants have not stated any reason as to why the Plaintiff is not entitled to liquidated damages under the Trust Agreements. Therefore, a total of $29,505.61 in liquidated damages is mandatory under ERISA, and the balance is due under the Trust Agreements. (Higa Decl. ¶¶ 24–29, Ex. 8, 9, 13.1–13.21, 14.3.)

### 3. Interest on Unpaid Monthly Contributions

Plaintiff also seeks $1,092.55 in interest on the delinquent fringe benefit contributions owed by Defendants. (Hamasaki Decl. ¶ 16.) Under ERISA, prejudgment interest is mandatory and is "determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of title 26." 29 U.S.C. § 1132(g)(2). Here, the plan provides for interest at 5% above the discount rate set by the Federal Reserve Board which, during the period of Precision's liability, ranged from 5.75% to 7.0 per annum. (Higa Decl. ¶¶ 17, 26–27.) Interest was calculated based on the monthly reports submitted by Precision and the audit reports from the due date of the monthly contributions through December 27, 2017. (*Id.* ¶ 26, Exs. 14, 14.2.) After $824.90 in interest was collected from Precision's prime contractor, the total interest sought by Plaintiff was $1,076.08. (*Id.* ¶ 26.) Interest continued to accrue at the rate of 7.0% from December 28, 2017 until February 26, 2018 (the date of Motion for Default Judgment), which totals $16.47 (61 x $0.27). (Hamasaki Decl. ¶ 16.) Therefore, Plaintiff seeks interest in the sum of $1,092.55. (*Id.*)

Plaintiff is entitled to interest because Plaintiff prayed for such damages in the Complaint. (FAC ¶¶ 29, 35, 44); *see* Fed. R. Civ. P. 54 ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."). The Court concludes that the delinquency spreadsheet and related documents

sufficiently evidence Plaintiff's entitlement to $1,092.55 in interest. (Higa Decl., Ex. 14.2.)

### 4. Audit Costs

Plaintiff seeks to recover the costs of the audit, which Plaintiff's counsel declares to be $720.00. (Higa Decl. ¶ 10.) This consists of $480.00 from the first audit and $480.00 from the second audit. (*Id.*) The Ninth Circuit has held that audit costs are recoverable under § 1132(g)(2)(E). *Operating Eng'rs Pension Tr. v. A-C Co.*, 859 F.2d 1336, 1343 (9th Cir. 1988). Therefore, the Court awards Plaintiff audit costs in the amount of $720.00.

///

### 5. Attorneys' Fees

Next, Plaintiff requests $48,175.00 in attorneys' fees. (Hamaski Decl. ¶¶ 18–24.) In an action under 29 U.S.C. § 1132(g)(2), attorneys' fees are mandatory. Plaintiff uses the lodestar method to calculate attorneys' fees. (Mot. 20.) Under the Local Rules for this district, however, attorneys' fees awarded upon default judgment are generally calculated according to a fee schedule. C.D. Cal. L.R. 55-3. When "[a]n attorney claim[s] a fee in excess of this schedule[,] [he] may file a written request at the time of entry of the default judgment," and the Court "shall hear the request and render judgment for such fees as the Court may deem reasonable." *See Aiuppy v. Set Glob. Inc.*, No. CV 13-07198 DDP (PJWx), 2015 WL 5838461, at *2 (C.D. Cal. Oct. 5, 2015) (where counsel requests a fee award in excess of that provided in the Local Rules, "the Court [must] determine if the departure from the Local Rules is reasonable under the lodestar method").

Here, Plaintiff seeks departure from Local Rule 55-3 and requests $48,175.00—in excess of the default schedule—due to Defendants' delays and refusal to cooperate with the audit of its records. (Hamaski Decl. ¶ 24.) Attorneys' fees under ERISA § 502(g)(1) "are calculated using the lodestar approach, which multipl[ies] the number of hours reasonably expended by the attorney(s) on the litigation by a reasonable

hourly rate." *McElwaine v. U.S.W., Inc.*, 176 F.3d 1167, 1173 (9th Cir. 1999). The Court then determines whether the hours spent and the rate charged were reasonable.

A district court has "wide latitude in determining the number of hours that were reasonably expended by the prevailing lawyers." *Sorenson v. Mink*, 239 F.3d 1140, 1147 (9th Cir. 2001). The fee applicant "bears the burden of documenting the appropriate hours expended in litigation and must submit evidence in support of hours worked." *Gates v. Deukmejian*, 987 F.2d 1392, 1398 (9th Cir. 1992). The services performed by the attorney, Marsha M. Hamasaki, total 80.7 hours, and services performed by the paralegal, Jennifer Okita, total 37.9 hours. (Hamasaki Decl. ¶ 19.) The attached exhibit, from the firm's billing records, details the specific tasks and work completed by the attorneys and paralegals and does not suggest duplicate hours or hours that are otherwise unnecessary. (*Id.*, Ex. 13); *see Perkins v. Mobile Hous. Bd.*, 847 F.2d 735, 738 (11th Cir. 1988) ("Sworn testimony that, in fact, it took the time claimed is evidence of considerable weight on the issue of the time required in the usual case."). Considering Defendants' refusal to participate in the litigation or to submit to audit reports, the Court finds that the number of hours performed is reasonable.

To determine whether the hourly rates are reasonable, the Court can consider whether "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Trs. of S. Cal. IBEW–NECA Pension Plan v. Electro Dynamic Servs.*, CV 07–05691 MMM (PLAx), 2008 WL 11338230, at *5 (C.D. Cal. Oct. 14, 2008) (citing *Blum v. Stenson*, 465 U.S. 886, 895–96, n.11 (1984)).

Plaintiff seeks $550 per hour for the time of attorney Marsha Hamasaki, and $100 per hour for the time of paralegal Jennifer Okita. (Mot. 21; Hamasaki Decl. ¶ 27.) Based on the hours worked through November 2017, Plaintiff requests a total of $48,175.00 in attorneys' fees, consisting of $44,385.00 for Hamasaki's services and $3,790.00 for Okita's services. (Hamasaki Decl. ¶ 27.) Attorney Marsha M.

Hamasaki was admitted to practice in California in 1982 and has focused almost exclusively on ERISA litigation ever since. (*Id.* ¶ 20.) Moreover, she previously served as in-house counsel, where she exclusively handled ERISA litigation, and has been the principal attorney in several ERISA suits. (*Id.*)

Plaintiff also refers the Court to two surveys and previous awards given to this counsel in order to support the reasonableness of the rate. First, Plaintiff refers to the Laffey Matrix, which is based on the hourly rates allowed in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983). The Laffey Matrix provides a rate of $581 per hour for Marsha Hamasaki based upon her thirty-five years of experience. (Hamasaki Decl. ¶ 23, Ex. 14.) Second, Plaintiff refers to the United States Consumer Law Attorney Fee Report for 2015–16. According to this survey, the average fee rate in Los Angeles Metropolitan Area in 2016 for attorney Hamasaki was $619 per hour. (*Id.* ¶ 24, Ex. 15.) Lastly, Plaintiff refers to previous awards for service of the same attorney in the same type of case. (*Id.* ¶ 25.) Considering both surveys, inflation, and the greater experience of the counsel now, the Court finds that Hamasaki demonstrates that her skill and experience justify the hourly rate.

Finally, the Court must look to the *Kerr* factors[4] in determining whether the lodestar figure is reasonable and if it should be adjusted. *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), *abrogated on other grounds by City of Burlington v. Dague*, 505 U.S. 557 (1992). When looking at the totality of the circumstances, none of the *Kerr* factors necessitate that the Court adjust the lodestar

---

[4] The *Kerr* factors assess reasonableness of attorneys' fees, and are not determinative, and are largely subsumed by the lodestar calculation itself. *Clark v. City of Los Angeles*, 803 F.2d 987, 990–91 (9th Cir. 1986). They include: (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill requisite to perform the legal services properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Kerr*, 526 F.2d at 70.

figure. Thus, $48,175.00 is a reasonable amount of attorneys' fees, and the Court awards it in full.

### 6. Costs

Next, Plaintiff seeks $1,088.75 in costs incurred pursuing this action, which includes the $400 filing fee, $80.32 to serve the Complaint on Precision, $78.50 to serve the Court's Interlocutory Order for Accounting, $42.50 to serve the Court's Order to Show Cause Regarding Contempt on KerryAnne Anzalone, $80.95 to serve the FAC on Precision, 44.74 to serve the FAC on KerryAnne Anzalone, $233.24 to serve FAC on Blase Anzalone, and a $50.00 investigation fee to obtain KerryAnne Anzalone's complete social security number for the U.S. Marshal. (Hamasaki Decl. ¶ 28, Exs. 19.1–19.9.) Pursuant to 29 U.S.C. § 1132(g)(2)(D), costs of the action are recoverable. Here, Trustees' filing fees and fees for service of process are reasonable and recoverable, and, thus, the Plaintiff may file a Notice of Application to the Clerk to Tax Costs after the Court enters judgment. C.D. Cal. L.R. 54-3.1, 54-3.2.

///
///
///
///
///
///
///
///
///
///
///
///
///
///

1  ///
2  ///
3  ///
4  ///
5  ///
6  ///
7  ///
8  ///
9  ///
10  ///
11  ///

## V.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's Motion for Entry of Final Default Judgment.  (ECF No. 65.)  Additionally, the Court finds that the Plaintiff is entitled to a Final Order for Accounting and **ORDERS** Defendants to submit to an audit of Precision's payroll and business records, as outlined above. Defendants, jointly and severally, shall pay Plaintiff the following amounts:

- **$81,969.24** against Precision Masonry Builders, Inc., consisting of:
  - o  $1,387.33 in fringe benefit contributions
  - o  $29,505.61 in liquidated damages
  - o  $720.00 in audit fees
  - o  1,092.55 in interest
  - o  $48,175.00 in attorneys' fees; and
  - o  $1,088.75 in costs
- **$81,249.24**  against  KerryAnne  Anzalone,  and  Blase  Anzalone,  Jr., consisting of:
  - o  $1,387.33 in fringe benefit contributions
  - o  $29,505.61 in liquidated damages

o  1,092.55 in interest

o  $48,175.00 in attorneys' fees; and

o  $1,088.75 in costs

The Court **ORDERS** Plaintiff to submit a proposed judgment consistent with this order no later than **March 26, 2018.**

**IT IS SO ORDERED.**

March 19, 2018

_____

**OTIS D. WRIGHT, II**

**UNITED STATES DISTRICT JUDGE**